*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* D. B. H. MOORE, Minor.

UNPUBLISHED
February 12, 2026
10:46 AM

No. 373464
St. Clair Circuit Court
Family Division
LC No. 24-000106-NA

Before: GADOLA, C.J., and CAMERON and RICK, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her minor child, DBH, under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), and (j). We affirm.

## I. FACTS

In November 2023, DBH was born prematurely at 35 weeks, weighing 5 pounds, 14 ounces. Dr. Annette Barnes-Grain, a pediatrician, saw DBH 20 days after his birth at which time he weighed 5 pounds, 6.5 ounces. Respondent reported that she was having issues feeding DBH; she was exclusively breastfeeding DBH and said that he would spit up or vomit after feeding. Dr. Barnes-Grain advised respondent about feeding technique and recommended that respondent supplement DBH with vitamin D drops.

At a follow-up appointment for DBH on December 4, 2023, respondent reported that DBH continued to spit up and choke after feeding. DBH now weighed 6 pounds. Dr. Barnes-Grain prescribed an antacid for the baby, recommended prebiotics, and gave respondent samples of the vitamin D drops and the prebiotic. Dr. Barnes-Grain also provided respondent with maternal and infant health community resources and a referral to the St. Clair County Health Department, which included a lactation consultant and nursing guidance. Respondent failed to participate in the referred services.

On January 19, 2024, respondent attended another appointment for DBH with Dr. Barnes-Grain, during which the doctor noted that the prescription for the antacid had not been filled. DBH now weighed 7 pounds, 6.5 ounces; respondent reported that DBH continued to spit up and choke

-1-

after eating. Dr. Barnes-Grain noted that DBH was not gaining weight as quickly as he should have been. Dr. Barnes-Grain ordered an ultrasound for DBH to rule out an intestinal obstruction, and again recommended that respondent meet with a lactation consultant from the health department. Respondent thereafter missed the scheduled ultrasound appointment, did not return calls attempting to reschedule the ultrasound, and failed to contact the services recommended by Dr. Barnes-Grain.

Respondent failed to bring DBH for his scheduled appointments with Dr. Barnes-Grain in February and April 2024. Respondent later explained that she was uncertain whether she had insurance coverage for the baby. Dr. Barnes-Grain testified that when there is an acute issue, she sees patients without insurance. On March 16, 2024, respondent brought DBH to Lake Huron Medical Center (LHMC) and reported that the baby was constipated. He weighed 9 pounds, 7.7 ounces. DBH was treated at the hospital and was told to follow up with Dr. Barnes-Grain, which respondent failed to do at that time.

Respondent brought DBH for an appointment with Dr. Barnes-Grain on May 15, 2024, at which time he was six months old and weighed only 7.4 pounds. Dr. Barnes-Grain testified that by this time, DBH should have had significant weight gain; instead, DBH looked ill, was fragile, was significantly malnourished, and had a weak cry. The baby's heart rate was extremely low, he was emaciated and had no muscle mass, and his breathing was shallow, indicating respiratory distress. Dr. Barnes-Grain testified that a six-month-old typically is visually engaged, sitting up with support, demonstrating good head control, rolling over, smiling, and engaging socially.

Dr. Barnes-Grain was so concerned about DBH's health that she escorted respondent and the baby to the emergency room at LHMC. DBH was transferred to Children's Hospital, where he was diagnosed with failure to thrive and lethargy. DBH's blood sugar level was under 10 milligrams per deciliter (mg/dL), compared to a normal blood sugar level of 70 mg/dL, which created a risk that DBH would go into cardiac arrest, become unresponsive, or have a seizure. There was no medical reason, such as diabetes, for DBH's low blood sugar. DBH's heartrate was approximately 60 to 70 BPM, which Dr. Barnes-Grain testified indicated prolonged malnutrition. He also had low calcium, which can cause seizures and heart arrhythmia. A skeletal survey of DBH showed that he had multiple fractured ribs and "diffuse demineralization," which would cause his bones to be weaker than those of a healthy infant.

Dr. Bradley Norat, the medical director of the Child at Risk Evaluation team at Children's Hospital, testified that when DBH was admitted, he weighed 7 pounds, 8 ounces, which is significantly below the first percentile of weight for a child of his age. Dr. Norat testified that testing showed that DBH had low vitamin D levels, and that there was no medical explanation for his low weight or his low calcium other than inadequate nutrition. According to Dr. Norat, if DBH had not been admitted, he likely would have died. While at the hospital, DBH did not have any issues with choking while feeding, and gained significant weight each day that he was hospitalized.

Children's Protective Services (CPS) investigator Rebecca Hartman testified that she informed respondent that because the child had a physical injury, the police would be notified, but that respondent did not seem to grasp the severity of the situation. Respondent was frustrated with the CPS involvement and thought it was solely because her insurance had lapsed. She was unconcerned about DBH's size and said that no one had indicated any concern. Respondent also

told Hartman that she had been feeding DBH every five to six hours, but that he was not interested in eating. Respondent stated that she had not followed up with recommended services because her insurance had lapsed and she was trying to fix that first. However, no insurance was needed for Maternal and Infant Health Services or the St. Clair County Health Department.

Detective Brandon Helmrich, with the St. Clair County Sherriff's Office, visited respondent and DBH at Children's Hospital. Respondent appeared concerned about DBH's choking, acid reflux, and rib fractures, and stated that DBH possibly was not getting enough breast milk. Respondent was upset that DBH was being given formula in the hospital but acknowledged that he was gaining weight. She showed Detective Helmrich numerous documents for services and recommendations, and admitted that she had not contacted any of the resources.

Detective Helmrich met with Dr. Kevin Daisy at Children's Hospital, who informed the detective that DBH's blood sugar levels were among the lowest he had seen as a physician. Dr. Daisy also informed the detective that DBH's rib fractures were in multiple states of healing, which indicated that the fractures did not stem from one incident.

On May 21, 2024, a team-decision meeting was held, during which Hartman spoke with respondent about DBH's malnourishment. Respondent acknowledged that she had not followed through with the referrals, but continued to blame the situation on her uncertainty regarding her insurance. Respondent did not react to the information that DBH could have died nor to the information that DBH had not had a choking incident while hospitalized. Respondent did not acknowledge that DBH had not been getting enough breast milk.

Following the team-decision meeting, petitioner, the Department of Health and Human Services (DHHS), filed a petition to terminate respondent's parental rights at the initial disposition and requested the removal of DBH from respondent's care. The trial court entered an order taking custody of the child under MCL 712A.2(b) on the basis that the child had suffered physical harm, malnourishment, and medical neglect. When DBH was released from the hospital, he was placed in foster care. In separate proceedings, respondent pleaded guilty to attempted second-degree child abuse, admitting that she failed to follow through with medical treatment and proper feeding for DBH, causing the child to suffer physical harm.

In this case, after a preliminary hearing the trial court authorized the petition and found that placement with respondent presented a substantial risk of harm to DBH's well-being, and that as a result reasonable efforts to reunify the family were not required. After an adjudication hearing, the trial court assumed jurisdiction of the child under MCL 712A.2(b). A further hearing was held regarding the best interests of the child, during which Sarah Biscarner, a foster care specialist with the Department of Health and Human Services, testified that respondent was no longer incarcerated. There had been no parenting times for respondent because of the nature of the allegations. DBH was doing well in his foster placement and had gained a substantial amount of weight. Although he was behind developmentally, he was participating in physical therapy and occupational therapy to gain strength and catch up on his developmental milestones. He also was being treated by a hematologist for low hemoglobin and iron. The soft spot in his head had begun to close prematurely, so a plastic surgeon was monitoring DBH's head. DBH was going to begin seeing an eye doctor for an issue with his right eye.

Biscarner testified that she met with respondent and it appeared that respondent understood that DBH had many medical issues; respondent claimed there was a genetic cause for these issues, however. Biscarner was concerned that respondent would not ensure that DBH received proper medical care if placed in her home, which required coordinating his appointments with several doctors. Biscarner also expressed concern about the amount of time that respondent would need to learn parenting techniques to adequately care for DBH; she explained that feeding is a basic need and does not require that a person have a high level of education or skill, but respondent had not fed DBH adequately. Biscarner further testified that DBH was beginning to flourish in foster care and that the foster parents potentially were willing to adopt the child. She opined that the child needed the stability and permanency provided by the foster home to continue to progress.

Respondent testified that she had been sentenced to probation for one year and six months under the Holmes Youthful Trainee Act, MCL 762.11 *et seq*. Respondent testified that she participated in a parenting education program before she was released from incarceration, but that the program focused on parenting children ages three and up and therefore was not very helpful. Respondent testified that she was willing to engage in any court-ordered services, that she was looking for a job, and also was working to obtain her driver's license. She testified that she planned to live with her mother, who also had a history of CPS involvement.

Respondent testified that she had a lot of time to think about what had gone wrong and what she would do differently. She now knew that DBH's insurance had to be looked up by an identification number, not his name, and she knew that she needed a more reliable cell phone for appointments. Respondent acknowledged that she had not been a responsible parent. She believed that with the knowledge she had now, she could engage with services and education and be able to show her ability to parent within four or five months. She loved DBH and did not want her parental rights to be terminated. Respondent acknowledged that she had several conditions to her probation, including getting her high school diploma, working at least 30 hours per week, and completing a cognitive behavior course. If her parental rights were not terminated, she planned to get a factory job and find day care for DBH or have her sister watch him. However, respondent then testified that she had fed DBH adequately, though she agreed that she previously admitted that DBH had nearly died because she had not fed him adequately.

After the hearing on the best interests of the child, the trial court found that clear and convincing evidence established that termination of respondent's parental rights to DBH was warranted under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury), (b)(*ii*) (parent failed to prevent physical injury), (g) (failure to provide proper care), and (j) (reasonable likelihood child will be harmed if returned to parent). The trial court further found that a preponderance of the evidence established that termination of respondent's parental rights was in the best interests of the child. Respondent now appeals.

## II. DISCUSSION

### A. REASONABLE EFFORTS

Respondent contends that the trial court erred by terminating her parental rights at the initial dispositional hearing, and that she should have been provided services with the goal of reunification of respondent and DBH. We disagree.

In general, the DHHS must make reasonable efforts to reunify families before seeking to terminate parental rights. MCL 712A.19a(2); *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). Absent aggravated circumstances, termination of parental rights is not appropriate unless reasonable efforts at reunification have been made. *In re MJC*, 349 Mich App 42, 49-50; 27 NW3d 122 (2023). As part of the reasonable efforts, the DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks*, 500 Mich at 85-86.

However, the trial court may terminate a respondent's parental rights without reasonable efforts being made toward reunification when aggravated circumstances exist. MCL 712A.19a(2)(a) provides that reasonable reunification efforts are not required if "[t]here is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638." See also *In re Rippy*, 330 Mich App 350, 358-359; 948 NW2d 131 (2019). Under MCL 722.638(2), aggravated circumstances sufficient for petitioner to seek termination without reasonable efforts toward reunification include when the parent "is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk." See also MCR 3.977(E).

In this case, termination of respondent's parental rights without reasonable efforts toward reunification was appropriate because the trial court determined that aggravated circumstances were present. See *In re Rippy*, 330 Mich App at 358-359. The trial court determined that respondent had placed DBH at an unreasonable risk of harm by failing to take steps to eliminate the risk posed by his low weight. This finding is supported by the record. When admitted to the hospital, DBH was below the first percentile for weight and was at risk of imminent death. Respondent admitted that she had noticed DBH losing weight, but did not seek medical care for the child until May 2024, at which time the child was near death. Respondent did not follow through with referrals for services aimed at helping her care for the child. Moreover, respondent did not take the reasonable step of adequately feeding DBH. Respondent pleaded guilty to attempted second-degree child abuse and acknowledged that she failed to feed DBH adequately. It was medically determined that DBH's failure to thrive was caused by lack of nutrition, not by an underlying condition. The trial court therefore did not err by terminating respondent's parental rights without ordering reunification services.

We reject respondent's argument that termination of parental rights was not warranted because there was no demonstration that her neglect of the child was intentional. As discussed, MCL 722.638(2) provides that aggravated circumstances include when the parent "is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk," without reference to the intent underlying the parent's actions. At the time respondent sought medical help for DBH, the child was extremely underdeveloped for his age, visibly emaciated, barely moving, and appeared very ill. DBH's low weight and malnutrition was determined to have been caused by respondent's failure to feed the child adequately and failure to seek medical care when the child began showing signs of malnutrition. The trial court did not err by finding that aggravated circumstances warranted termination of respondent's parental rights without the provision of services.

## B. BEST INTERESTS

Respondent contends that a preponderance of the evidence does not support the trial court's finding that termination of her parental rights is in DBH's best interests. We disagree.

When the trial court finds that a statutory basis for terminating a parent's rights has been established, the trial court must terminate the parent's rights if a preponderance of the evidence demonstrates that termination is in the child's best interests. MCL 712A.19b(5); *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 5. We review for clear error the trial court's decision that termination of parental rights is in a child's best interests. *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021). In doing so, we focus on the child rather than the parent. *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). A trial court's decision is clearly erroneous if although there is evidence to support it, upon reviewing the entire evidence we are "left with the definite and firm conviction that a mistake has been made." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (quotation marks and citation omitted).

When determining the best interests of a child in a termination proceeding, the trial court must weigh the available evidence and consider a wide variety of factors, such as the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, the advantages of the foster home over the parent's home, the length of time the child has been in care, the likelihood that the child could be returned to the parent's home in the foreseeable future, the child's age, the parent's inappropriate parenting techniques, the child's well-being in care, and the possibility of adoption. See *In re Sanborn*, 337 Mich App 252, 276-277; 976 NW2d 44 (2021).

Here, a preponderance of the evidence supports the trial court's determination that the child's need for safety and fundamental basics, such as adequate food and medical care, necessitated termination of respondent's parental rights. Respondent's lack of parenting ability resulted in DBH being hospitalized for malnutrition; respondent did not seek medical care for the child until he was near death. Respondent gave conflicting answers about when and how much she fed DBH, failed to take the child to scheduled appointments, failed to follow recommended medical advice from the child's pediatrician, and failed to participate in services recommended by the pediatrician to assist respondent with the child's care. Respondent appeared to lack either understanding or concern that her failure to provide basic care for the child led to the child's severe lack of development and nearly caused the child's death. After the child was placed in foster care, he began to gain weight, to improve in health, and to make progress on developmental milestones. In addition, his foster parents expressed interest in adopting him. The record therefore supports the trial court's determination that termination of respondent's parental rights was in the child's best interests.

Affirmed.

/s/ Michael F. Gadola
/s/ Thomas C. Cameron
/s/ Michelle M. Rick